UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIO MADRID,

               Plaintiff,                    No. 17-11266

v.                                  District Judge Denise Page Hood
                                       Magistrate Judge R. Steven Whalen

GLENN KING, ET AL.,

               Defendants.

_____ /

## REPORT AND RECOMMENDATION

Currently before the Court are separate motions for summary judgment by Defendants

Olmstead and King, filed respectively on April 1 and April 4, 2019 which have been referred

for Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).  *Docket #67, 69.*  For the

reasons set forth below, I recommend the following:

> Defendant Olmstead's Motion for Summary Judgment [Doc. #67] should be
> GRANTED.

> Defendant King's Motion for Summary Judgment [Doc. #69] should be
> DENIED as to the First Amendment retaliation claims.  Because Plaintiff did
> not include Eighth Amendment claims against Defendant King in his
> Amended Complaint, the arguments for their dismissal are MOOT.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

On April 21, 2017, Plaintiff Mario Madrid ("Plaintiff"), formerly a prison inmate in

the custody of the Michigan Department of Corrections ("MDOC"), filed a civil complaint through counsel under 42 U.S.C. § 1983, alleging violations of his First and Eighth Amendment rights by Mark Holey ("Holey"), Cindy Olmstead ("Olmstead"), and MDOC employee Glenn King ("King").[1] He filed an amended complaint on February 14,2019 [ECF No. 62].

Plaintiff, represented by counsel, makes the following allegations:

During his incarceration at the G. Robert Cotton Correctional Facility ("JCF") in Jackson, Michigan, Plaintiff was employed by the Michigan Braille Transcribing Fund ("MBTF") as a Braillist certified by the Library of Congress in Literary and Nemeth transcription.[2] *Amended Complaint,* ¶ 1-2. (ECF No. 62, PageID.643). At the time of the September, 2014 events in question, Defendant Olmstead was the Director of MBTF and former Defendant Holey was Olmstead's assistant. *Id.* at ¶ 3. Defendant King, an MDOC Corrections Officer, "worked within the confines of [the portion of JCF set aside for use by MBTF] for security purposes." *Id.* MBTF paid MDOC for security services. *Id.*

Plaintiff alleges that Defendant King sexually harassed prisoner employees within the MBTF by placing pornographic materials of male genitalia on their work stations and person. *Id.* at ¶ 4. Defendant King would also recount "hand masturbating his dog" to MBTF

---

[1]While Cindy Olmstead is referred to as "Omstead" in the Complaint, her responsive pleading lists her name as Olmstead.

[2]Plaintiff states that the MBTF "trains and employs JCF inmates in transcribing reading materials for the blind." *Amended Complaint* at ¶ 2.

employees. *Id.* On September 11, 2014, Defendant King began sexually harassing Plaintiff by placing pornographic material on his person and workstation. *Id.* at ¶ 5. When Plaintiff objected to Defendant King's actions, King made verbal threats to Plaintiff which included doing "what he wants to with Plaintiff" and having Plaintiff transferred. *Id.* In response, Plaintiff "immediately logged verbal complaints" with Defendant Olmstead "about the sexual harassment and retaliatory threats." *Id.* at ¶ 6. Plaintiff also made verbal complaints to Holey. *Id.* The next day, Defendant King contacted "another MDOC employee" and asked to have Plaintiff moved to a different unit because "'he was too big for his britches.'" *Id.* at ¶ 7. Plaintiff was moved to the "F Unit" which was commonly referred to as "'Cadys Doll House'" where many transgender prisoners were housed. *Id.* He was placed in a cell with a schizophrenic cell mate. *Id.* On September 14, 2014, Plaintiff filed a formal complaint against Defendant King, alleging "sexual harassment, retaliation, and unjustified move." *Id.* at ¶¶ 8-9. The following day, Plaintiff was moved back to his original room in Unit E. *Id.* at ¶ 9.

On September 19, 2014, Defendant King issued a misconduct ticket to Plaintiff for being "Out of Place" which Plaintiff describes as "a backdoor means of using prison rules as a form of punishment and retaliation related to [Plaintiff's] work." *Id.* at ¶ 10. On September 30, 2014, Plaintiff was found guilty of the misconduct and given three days of loss of privileges. *Id.* at ¶ 11. Upon rehearing, Plaintiff was found not guilty. *Id.* Plaintiff lodged verbal and written complaints with "various MDOC staff" asking to have Defendant

King's work computer seized and searched for pornography in the hope that King's "campaign of harassment and retaliation would stop." *Id.* at ¶ 12.

On October, 9, 2014, Defendant King's work station was searched for evidence of pornography and other "misconduct." *Id.* at ¶ 13. On or around the same day, Defendant Olmstead lifted Plaintiff's "hold" which had previously been put in place to keep him from being transferred. *Id.* at ¶ 14. As a result, Plaintiff was transferred to another facility which resulted in the loss of his well-paying job as a Braillist. *Id.* at ¶¶ 14-15. At the time of Plaintiff's transfer, he had been employed with MBTF for over eight years. ¶ 15. After filing additional complaints about the transfer, he was informed that the transfer was approved by JCF's Warden "until the investigation can be completed." ¶ 16. However, Plaintiff was notified that he would be returning to JCF and his work at MBTF.

On or about November 12, 2014, Defendant Olmstead completed a Prisoner Program and Work Assignment Evaluation stating that she had discovered that Plaintiff "at some point in time[] had pornographic [picture] files on his computer." *Id* at ¶ 17. Plaintiff denies that he ever used his computer to look a pornography. *Id.* He alleges that Defendant Olmstead's "adverse action" of falsely reporting the discovery of pornography was done in retaliation "to ensure [he] would not be returned" to his job at MBTF. ¶ 18. He alleges that as a result of Defendant Olmstead's retaliation, he lost "a highly desirably career as a Braillist" upon his release from prison. ¶ 19. Plaintiff states that although Defendant King was later terminated from MDOC employment as a result of his actions, Plaintiff was not transferred

back to his MBTF position. ¶ 20. Through arbitration, Defendant King was eventually reinstated by the MDOC. *Id.* at ¶ 21. Following Defendant King's reinstatement, he allegedly boasted Plaintiff was the "only one not present, and not working here now." *Id.*

Plaintiff alleges that his complaints against Defendant King resulted in "adverse actions" which would "deter persons of ordinary firmness from continuing the protected conduct." *Id.* at ¶ 22. Plaintiff alleges that despite "verbal complaints" regarding Defendant King's sexual harassment to Defendant Olmstead, she failed to investigate or report the complaints, exposing Plaintiff to "misconduct and retaliation." *Id.* at ¶ 23. He alleges that Defendant Olmstead "turned a blind eye for years to numerous sexual violations within MBTF," including an instance where her staff was impregnated by an inmate which constitutes "a serious violation" of the Prison Rape Elimination Act ("PREA"). *Id.* at ¶ 24.

On March 1, 2018, the Honorable Avern Cohn adopted my recommendation to grant in part and deny in part former Defendant Holey and Defendant Olmstead's motion to dismiss. *Docket* #22, 25, 29. The motion was granted as to the Eighth Amendment claims against Holey and Olmstead and granted as to the First Amendment retaliation claim against Holey. The motion was denied as to the First Amendment retaliation claim against Defendant Olmstead.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).  Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate.  *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  The non-moving party must identify specific facts in affidavits, depositions or other factual material showing

"evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at

252 (emphasis added). If the non-moving party cannot meet that burden, summary judgment

is proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III.   ANALYSIS

#### A. Defendant Olmstead

Defendant Olmstead contends she is entitled to summary judgment for multiple

reasons. (ECF No. 67-1, PageID.702). First, she contends that although MBTF contracts

with MDOC for the employment of prisoners, she is not a "state actor" and thus not subject

to claims under 42 U.S.C. § 1983. (ECF No. 67-1, PageID.703.). Second, she argues that

even assuming that she is a state actor, the adverse actions experienced by Plaintiff, *i.e.* his

transfer to another facility and loss of the MBTF position "are sole and exclusive functions

of MDOC" and her actions pertaining to the events in question were wholly bound by

MDOC procedure. (ECF No. 67-1, PageID.706). She denies retaliating against Plaintiff.

#### 1. Defendant Olmstead is a State Actor

Defendant Olmstead, President and Chief Executive Officer of MBTF,  renews her

previously rejected argument that she is not subject to claims under § 1983 because she is not

a state actor. On March 1, 2018, the Honorable Avern Cohn adopted my finding that

Plaintiff had sufficiently pled that Defendant Olmstead was a state actor for purposes of this

action. (ECF No.29 , PageID.478). Applying the test set forth in *Phelps v. Dunn*, 965 F.2d

93, 102 (6th Cir.1992)(*citing Lugar v. Edmondson Oil Co., Inc*., 457 U.S. 922, 102 S.Ct.

2744, 73 L.Ed.2d 482 (1982)), I considered the following factors:

> MBTF operates solely within the grounds of JCF, an MDOC facility. MBTF uses the same address as JCF on its letterhead and its telephone number (although it has its own extension) is the same as JCF's. MBTF, a non-profit, uses prison labor. Olmstead, the director of MBTF, created the wage scales for prisoners employed by the MBTF. Olmstead hired prisoners and the relationship between the prisoners and MBTF is dictated by the MDOC Policy Directive. The MBTF salary cap is also dictated by MDOC policy.

(ECF No.22 , PageID.368). I also noted Plaintiff's claim that Defendant Olmstead had the ability to place a "hold" on a prisoner employee to prevent a prison transfer to another facility, giving her veto power over a proposed transfer by the MDOC.[3]  *Id.*    While Defendant Olmstead now claims that she "has never had [] 'hold' authority over prisoners" to circumvent transfers, (ECF No. 67-1, PageID.705), she testified at deposition that although there was "no formal document" used in requesting that an MBTF prisoner/employee not be transferred, there was "an understanding between the Department of Corrections and Michigan Braille Transcribing Fund that prisoners who work for Braille are not transferred out of . . . JCF . . . due to the amount of training and skill level" required by the prisoner-employees to "perform their job." (ECF No. 67-10, PageID.925).

While it is undisputed that Defendant Olmstead could not order a transfer (and in some cases not prevent a transfer) she acknowledged that at a minimum, she could discourage MDOC decision-makers from facilitating the transfer of MBTF

---

[3]    The rationale for denying Defendant Olmstead's claim that she is not a state actor is set forth in its entirety in the same Report and Recommendation. (ECF No. 22 , PageID.366-369).

employee/prisoners.[4]    To be sure as discussed below, her ability to prevent Plaintiff's transfer was overridden by MDOC protocol of transferring prisoners making accusations of sexual harassment by staff members.  However, the conclusion that Defendant Olmstead was a state actor is supported by her testimony that she not only wrote periodic work evaluations of prisoner/employees but also wrote misconduct reports against individual prisoners and "critical incident summar[ies]" on multiple occasions in response to prisoner malfeasance. (ECF No. 67-10, PageID.891-892)(ECF No. 67-10, PageID.910)(ECF No. 67-22, PageID.1198).  Writing misconduct reports in response to prisoner malfeasance, a core state function, also supports the Court's earlier finding that Defendant Olmstead was a state actor.[5]

---

[4]

Shawn Brewer, Executive Warden of the Women's Huron Valley Correctional Facility, also testified that in his former position as the former warden at JCF that MBTF "did not like to lose prisoners who are actively working in those assignments . . . due to the amount of investment they had in them and their training process and their certification at the Library of Congress." *Brewer Deposition* (ECF No. 67-8, PageID.793).

[5]

 I am mindful that in *Hudson v. DeForest*, 2010 WL 1141609, at *3 (E.D.Mich. March 24, 2010) the Court found that  MBTF Defendants were not state actors.  The Court reasoned that MBTF was "entirely privately funded, with its only provision in the state Appropriations Bill being the grant of use of the building . . . built by Defendant MBTF and later donated to . . . State of Michigan;" MBTF "run by a board of directors, only one of whom is an employee of the State of Michigan;" [a]ll hiring and firing decisions are made by Defendant MBTF; and "there [was] no contract between Defendant MBTF and the MDOC." However, a number of factors not considered in *Hudson* have been raised in the present case.  MBTF hiring of corrections officers, the setting of prisoner employee wages, MBTF's involvement in facility transfer decisions, and the writing of misconduct reports.

## 2. The First Amendment Retaliation Claim

As a threshold matter, Plaintiff's allegation that he was first, placed in a cell with a mentally ill inmate, second, received a misconduct ticket, and third, lost a lucrative prison job in retaliation for making complaints regarding the Defendant King's sexual harassment state claims of First Amendment violations. In *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999), the Sixth Circuit held that a retaliation claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."

Plaintiff's filing of grievances and other complaints regarding Defendant King's behavior is "protected activity." *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)("inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf"). Plaintiff's placement with a mentally ill cellmate, the issuance of a misconduct report, and loss of a well-paying job as a result of the complaints and grievances is sufficient to state an "adverse action." "The adverseness inquiry is an objective one, and does not depend on how a particular plaintiff reacted." *Thaddeus–X*, 175 F.3d at 396, 398. Defendant Olmstead's alleged "lifting of the hold" which cleared the way for a retaliatory transfer of Plaintiff "would deter a prisoner of ordinary firmness from continuing to engage in the protected conduct." *See Siggers-El v. Barlow*, 412 F.3d 693, 701–02 (6th Cir.

2005)(while "ordinarily a transfer would not deter a prisoner of ordinary firmness," a transfer coupled with the loss of a high-paying prison job was "adverse action"). Likewise here, Plaintiff's transfer, coupled with the loss of his eight-year position with the MBTF, constitutes an adverse action.

As to the first two acts of retaliation, Plaintiff has failed to allege any involvement by Defendant Olmstead. As discussed below in Section B, Defendant King has admitted that he was responsible for Plaintiff's temporary placement with a mentally ill cellmate. Plaintiff has likewise provided no evidence that would connect Defendant Olmstead to Defendant King's issuance of the misconduct ticket.

As to Plaintiff's transfer to another facility and the ultimate loss of his job as a transcriber, he cannot show that Defendant Olmstead's actions were motivated by retaliatory animus required to establish the causal connection prong of the retaliation claim. In his Amended Complaint, Plaintiff alleges that despite "verbal complaints" regarding Defendant King's sexual harassment to Defendant Olmstead, she failed to investigate or report the complaints, exposing Plaintiff to "misconduct and retaliation." (ECF No. 62, PageID.645), ¶ 23. However, Defendant Olmstead testified that she did not become aware of Defendant King's alleged sexual harassment of prisoners until Plaintiff reported King's harassment to her.[6] (ECF No. 67-10, PageID.905). Defendant Olmstead testified that she arranged a timely

_____

[6] While Plaintiff states that he actually made his verbal complaint to Defendant Olmstead on September 11, 2014, Olmstead appears to have put the date at approximately "October, 2014. (ECF No. 67-10, PageID.904).

meeting with JCF officials after Plaintiff reported the harassment (ECF No. 67-10, PageID.904). To be sure, Defendant Olmstead's meeting with JCF personnel appears to have been prompted by primarily logistical concerns; because she anticipated that Plaintiff's complaint of harassment required his transfer to another facility during the tenure of the investigation, his work for MBTF would be at least temporarily suspended. (ECF No. 67-10, PageID.963). While Defendant Olmstead's involvement in the complaint process appeared to have been motivated by her concerns that Plaintiff's work schedule would be interrupted, Plaintiff provides no evidence that she "failed to investigate or report" his complaints of harassment.

As to the transfer to a different facility, Defendant Olmstead has established that she was not involved in the decision to transfer Plaintiff. Plaintiff's transfer to another facility during the tenure of the investigation, by his own description, was proposed by the personnel at the JCF's Inspector's Office who told Plaintiff that "it would be easier for them to transfer me than to deal with everything [concerning the Plaintiff's claims against Defendant King]." *Plaintiff's Affidavit* (ECF No. 74-1, PageID.1890). Although Plaintiff states that he was told by Defendant Olmstead that he was "not going anywhere," *id.*, Defendant Olmstead testified, in effect, that faced with the institutional decision to transfer Plaintiff temporarily, she would arrange for his ultimate return to his position at MBTF (ECF No. 67-10, PageID.914).

While subsequent to the transfer, Defendant Olmstead wrote a misconduct report and work evaluation which prevented Plaintiff from resuming his work for MBTF, his

-12-

termination from the program was consistent with the MBTF's "zero tolerance" policy pertaining to contraband found at prisoner/employees' work stations. *See Deposition of Warden Shawn Brewer* (ECF No. 67-8, PageID.809), *Olmstead Dep.* (ECF No. 67-10, PageID.901)(ECF No. 67-10, PageID.924)(ECF No. 67-10, PageID.927)(ECF No. 67-10, PageID.948)(ECF No. 67-10, PageID.949). "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399. Plaintiff provides no evidence that in writing the work evaluation and misconduct report Defendant Olmstead was motivated by anything other than a good faith belief that Plaintiff had violated MBTF's zero tolerance policy. In other words, Defendant Olmstead has provided legitimate, non-retaliatory reasons for writing the reports leading to his termination from MBTF.

Assuming the truth of Plaintiff's allegations that Defendant King planted pornography on Plaintiff's computer, Plaintiff has provided no evidence to support the conclusion that Defendant Olmstead was aware of, much less complicit in Defendant King's alleged malfeasance. Defendant Olmstead testified that prior to Plaintiff's allegations, she was not aware that Defendant King had been accused of using an inmate's computer and that King's computer (unlike the MBTF's computers) was attached to MDOC's computers. (ECF No. 67-10, PageID.944). Defendant Olmstead stated that Plaintiff's termination from MBTF employment was due to the discovery of pornography following his transfer when another prisoner/ transcriber asked Olmstead to locate a missing file on Plaintiff's former computer.

(ECF No. 67-10, PageID.924)(ECF No. 67-10, PageID.946).  To be sure, fact discovery has brought to light Defendant Olmstead's long-term acquaintance with Defendant King and his wife. (ECF No. 67-10, PageID.904-5)(ECF No. 67-10, PageID.951).  However, aside from her acquaintance with Defendant King, Plaintiff has failed to provide any motive that she conspired with Defendant King to have him terminated from his position as a transcriber.  Contrary to Plaintiff's theory, Defendant Olmstead and others provided testimony that due to the time and cost of training prisoners for MBTF transcription, she made efforts to ensure that once trained, the prisoner/employees were not transferred.   (ECF No. 67-8, PageID.793)(ECF No. 67-10, PageID.922)(ECF No. 67-10, PageID.925)(ECF No. 67-10, PageID.958).  Defendant Olmstead also testified that until the discovery of pornography on Plaintiff's former computer, she anticipated that Plaintiff would return to his former position at the end of the investigation.  (ECF No. 67-10, PageID.914).

Further, Plaintiff has offered no motive (aside from Defendant Olmstead's acquaintance with Defendant King) much less evidence to support the conclusion that Olmstead was complicit in the planting of pornography on his former computer.   To the contrary, Defendant Olmstead  testified that after making significant investments in time and training, she was reluctant to lose Plaintiff's services as a highly skilled transcriber.   As such, the First Amendment retaliation claims against Defendant Olmstead should be dismissed.

Because Plaintiff cannot show a constitutional violation by Defendant Olmstead, I

agree with her argument that the claims are also barred by qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538 (6th Cir. 2008)(*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In determining whether claims are barred by qualified immunity, the courts consider (1) did the defendant violate a constitutional right, and (2) was the right clearly established to the extent that a reasonable person in the defendant's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *See also Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 812, 172 L.Ed.2d 565 (2009). In the absence of a constitutional violation, the court need not determine whether Defendant Olmstead's actions were reasonable or whether the right in question was "clearly established." *Dunigan v. Noble*, 390 F.3d 486, 495 (6th Cir. 2004).

### B. Defendant King

Defendant King argues that he is entitled to summary judgment on both the First Amendment retaliation claim and Eight Amendment sexual harassment claim. (ECF No. 69, PageID.1296). As to the retaliation claim, he notes that he issued a misconduct report against Plaintiff on September 19, 2014 and that following a guilty finding, the determination was upheld on appeal. (ECF No. 69, PageID.1310). Defendant King argues that he is entitled

to summary judgment on the Eighth Amendment claims because his actions, as alleged in the Amended Complaint, do not rise to the level of an Eighth Amendment violation.  *Id.*

Defendant King's arguments are considered in reverse order.

### 1.   Argument for Dismissal of Eight Amendment Claims is Moot

As a threshold matter, Plaintiff correctly notes in his response to the present motion that the Eight Amendment claims against Defendant King have been omitted from the Amended Complaint.  (ECF No. 74, PageID.1885).   Therefore, King's motion should be denied as moot as to the Eighth Amendment claim.

### 2.   The First Amendment Retaliation Claim

Defendant King argues, in effect, that the claims of retaliation against him do not satisfy the "causal connection" requirement under *Thaddeus*-X, *supra.  Docket #69* (ECF No. 69, PageID.1308).  Defendant King acknowledges that the issuance of a misconduct ticket constitutes an "adverse action."  Defendant King asserts that because Plaintiff was found guilty of the misconduct at the hearing and on appeal, he cannot "'collaterally attack the hearing's validity or . . . conduct underlying the disciplinary conviction unless the conviction or sentence is reversed on appeal, expunged by executive order, declared invalid by a state tribunal, or has otherwise been called into question by a federal court's issuance of a writ of habeas corpus.'" (ECF No. 69, PageID.1309)(*citing Clemens v. Cook,* 52 Fed. Appx. 762, 763 (6th Cir. December 11, 2002)); *see Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir.1994))("finding of guilt based upon some evidence of a violation of prison rules

-16-

'essentially checkmates [a] retaliation claim'").

   As a preliminary matter, Defendant King's claim that a guilty finding "checkmates" the Plaintiff's retaliation claim has been rejected by the Sixth Circuit. "This Court has never adopted the 'checkmate doctrine' in a published opinion." *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018). "We now reject that doctrine. A finding of guilt at a prison misconduct hearing does not act as an absolute bar to a prisoner's First Amendment retaliation claim."

   Moreover, Defendant King's claim that the misconduct report for being "out of place" was upheld on appeal is factually incorrect. Defendant King issued the out of place misconduct report to Plaintiff on September 19, 2014 for leaving "the braille building" at approximately 3:00 p.m. without authorization. (ECF No.69-7, PageID.1569). However, a misconduct hearing report indicates that upon appeal, the hearings officer accepted Plaintiff's defense that he had a staff member (Defendant Olmstead) "sign his itinerary authorizing him" to leave work and "go to his call out." (ECF No. 67-8, PageID.1570). The hearing officer found Plaintiff not guilty of the misconduct ticket of being "out of place," instead finding him guilty of the less serious Class III charge of violation of posted rules on the basis that prisoners must "check out with the officer [King] prior to leaving the assignment or building."

   Therefore, while Plaintiff was ultimately convicted of a Class III violation, he was found "not guilty" on appeal of the more serious Class II violation, charged by Defendant

King, of being "out of place."[7] (ECF No. 69-7, PageID.1569). Even assuming that the "checkmate" doctrine had not been rejected by the Sixth Circuit, Plaintiff's allegation that the misconduct ticket was issued in retaliation for his grievances regarding Defendant King's alleged behavior has not been "checkmated" by a guilty finding.

Setting aside Defendant King's erroneous claim that the Class II misconduct ticket was upheld on appeal, the sequence of events recounted in the Amended Complaint and supported by the evidence presented in response to the present motion creates an inference that the misconduct report was issued in retaliation for Plaintiff's protected activity. After Defendant King allegedly began harassing Plaintiff on September 11, 2014, Plaintiff immediately told him to stop the harassment. *Plaintiff's Affidavit,* ¶¶ 7-8 (ECF No. 74-1, PageID.1888). In response, Defendant King threatened him by stating that he could "do whatever he pleases," and have Plaintiff transferred. *Id.* at ¶ 8 (ECF No. 74-1, PageID.1889). Plaintiff states that he also immediately lodged complaints with Defendant Olmstead. *Id.* at ¶ 9. The next day, at the direction of Defendant King, Plaintiff was moved to the F-Unit, known by the nickname "Cady's Doll House," due to the fact that it housed many transgender prisoners. *Id.* at ¶ 10. Plaintiff was placed with a schizophrenic cellmate and was exposed to the cellmate's bizarre and violent behavior. *Id.*

---

[7]
For difference between Class II and Class Three (the least serious of the three classes of violations) *see* MDOC, Discipline-Prisoner Discipline.https://www.michigan.gov/corrections/0,4551,7-119-68854_68856_63694-292458--,00.html. (Last visited, February 24, 2020).

At Defendant King's deposition, he admitted twice that he called another staff member and arranged for Plaintiff be moved to the F-unit after Plaintiff informed Defendant King that due to King's sexual harassment, King would be removed from his job. *King Deposition,* (ECF No.74-3, PageID.1945), (ECF No.74-3, PageID.1947). Two days later on September 14, 2014, Plaintiff filed a formal complaint against Defendant King and one day later, was moved back to his former unit. *Plaintiff's Affidavit* at ¶¶ 11-12. (ECF No. 74-1, PageID.1889). Five days later, on September 19, Defendant King issued the misconduct report to Plaintiff for being out of place while on assignment. *Id.* at ¶ 13 *see also* (ECF No.69-7, PageID.1569). Plaintiff notes that a guilty finding of the Class II violation could have led to the termination of his job. *Id.* On September 30, 2014, Plaintiff was found guilty of the charge but later the same day, appealed the guilty finding to the warden and the charge was ultimately dismissed. *Id.* at ¶ 15.

Plaintiff states that on October 1, 2014, Defendant King advised him that he should "stop my complaints or things will get worse," noting that during the same period, he was filing complaints, "verbal and written, with various MDOC staff" members, asking that Defendant King's work computer be seized "in the hopes that the campaign [of] sexual harassment, threats, and retaliation would stop." On the morning of October 9, 2014, Defendant King's work computer was seized by MDOC staff. . *Id.* at ¶ 18. However, one hour later, Plaintiff "was unceremoniously transferred" to another facility. *Id.* Plaintiff notes that before his transfer, he already suspected that he would be "set up" by the placement of

-19-

contraband on his work computer and inspected his work area "daily" for contraband. *Id.* ¶ 19. He states that at no time during his tenure at MBTF did he have pornography on his computer. *Id.* He adds that he did not have internet access on his computer and that there would have been no way to upload pornography onto his work computer. *Id.* at ¶ 20.

James McGuff, a fellow prisoner/transcriber for MBTF, also states that the computers used by the prisoners did not have access to the internet and thus, the pornographic material could only have been uploaded by a USB or "thumb" drive. *McGuff Affidavit* (ECF No. 74-1, PageID.1895). Despite Defendant's Olmstead's testimony, *see above*, that the pornography was discovered on October 31, 2014, McGuff states that Defendant King announced earlier, the week of after Plaintiff's transfer, that Plaintiff "had pornography on his computer." *Id.* at ¶ 5. Plaintiff notes that around April 15, 2015, he was notified that under the PREA that the investigation instigated against Defendant King found "sufficient evidence to support that the alleged conduct occurred." (ECF No. 74-1, PageID.1890). at ¶ 23.

### a. The Transfer to Unit F

Defendant King does not dispute Plaintiff's claim that in the days leading up to the transfer, he complained to King directly and to other staff members of King's sexual harassment. It is well settled that "[a]n inmate has a right to file 'non-frivolous' grievances against prison officials on his own behalf, whether written or oral." *Glenn v. Greenleaf*, 2019 WL 6872879, at *3 (W.D.Mich. December 17, 2019)(*citing Maben*, *supra,* 887 F.3d at 265.

Plaintiff's allegation that one day prior to his transfer, he verbally protested the harassment to Defendant King directly is affirmed by King's deposition testimony.  (ECF No. 67-14, PageID.1042).  Plaintiff's undisputed claim that he was moved to a cell with a schizophrenic, disruptive, and potentially violent inmate constitutes an adverse action.   While "[c]ell assignments are a normal part of prison life, and thus typically do not amount to an adverse action," an assignment to a cell with a schizophrenic and potentially violent inmate describes "extraordinary circumstances with respect to . . . cell assignment," *LaFountain v. Harry*, 716 F.3d 944, 949 (6th Cir. 2013), which "'would deter [ ] a person of ordinary firmness,' even a prisoner, 'from exercising his or her right to access the courts.'"  *Id.* (*citing Thaddeus–X*, 175 F.3d at 398).  Finally, Defendant King's admission that he arranged for Plaintiff's move to a cell with a mentally ill cellmate because Plaintiff had confronted him about his allegedly termination-worthy harassment supplies the causal connection prong required to sustain a retaliation claim. (ECF No. 67-14, PageID.1042).

### b.  The Misconduct Ticket

Defendant King does not dispute that Plaintiff wrote a grievance against him on September 14, 2014 (one day after being transferred to Unit F) and that Plaintiff was transferred back to his former unit on September 15, 2014.  (ECF No. 74-3, PageID.1947). Defendant King testified  that he issued the "out of place" misconduct ticket on September 19, 2014.  *Id.*  He acknowledged that he never wrote a misconduct ticket for being out of place against any other prisoner/employee at MBTF.  (ECF No. 74-3, PageID.1947).  He

acknowledged that the Class II violation alleged resulted in three days loss of privileges. (ECF No. 74-3, PageID.1948).

Plaintiff's September 14, 2014 written grievance against Defendant King constitutes protected activity. *Maben*, *supra,* 887 F.3d at 265. Moreover, the loss of privileges for three days, at a minimum, raises a question of fact as to whether the penalty constituted an adverse action. *See Maben* at 267 ("In all, the deprivation of privileges is hardly inconsequential - indeed, they are all that prisoners really have. Furthermore, the issuance of the minor misconduct ticket subjected Maben to the risk of even more significant sanctions, including confinement to his cell, which is certainly not inconsequential")(internal citations omitted). A question of fact also remains as to whether Plaintiff can show a causal connection between his written grievance and the issuance of the misconduct ticket five days later. (1) Defendant King admitted that he had already arranged for Plaintiff's transfer to another unit in response to Plaintiff's verbal complaints, (2) upon appeal, the Class II charges were dismissed and, (3) Defendant Olmstead testified that she signed an authorization allowing Plaintiff to leave the MBTF after Plaintiff informed her that Defendant King was not available to sign the pass. *Olmstead Deposition* (ECF No. 67-10, PageID.947). Defendant Olmstead testified that she "signed it because there is - - we've not ever had an issue with [her signing passes]." *Id. See Houston v. Guinn*, 2019 WL 7884620, at *6 (E.D.Mich., 2019)("selective enforcement of prison rules," in some cases, is sufficient to raise a question of fact as to causation - "though [the inmate] violated a prison rule, [defendant] enforced this rule against him and

not others").

While it can be argued that the temporal proximity of five days between the written grievance and the misconduct report, by itself, is insufficient to establish causation, *see Hill v. Lappin*, 630 F.3d 468, 476 (6th Cir. 2010), the fairly short interval between the events, coupled with Defendant King's admitted retaliatory activity, the lack of previous problems when a prisoner obtained a pass from Defendant Olmstead, and the finding on appeal that the out of place misconduct report did not have merit, considered together, easily support the denial of summary judgment on these claims.

### c.  The Planting of Pornography on Plaintiff's Former Computer

As discussed above, Plaintiff's multiple written and verbal grievances to multiple staff members prior to his transfer to another facility constitute protected activity.   It is well-established that the loss of Plaintiff's job as a transcriber as a result of the allegedly planted pornography constitutes an adverse action.  *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999).  As to the third prong of the retaliation claim,  Plaintiff provides no direct evidence that Defendant King planted pornography on Plaintiff's former work computer.  Defendant King denies that he planted pornography on Plaintiff's computer.   (ECF No. 67-14, PageID.1054).

However,  at a minimum, circumstantial evidence supports the sabotage claims. Setting aside that Plaintiff's efforts to have Defendant King's work computer searched for pornography constitutes a motive for "tit-for-tat" behavior (ECF No. 74-1, PageID.1889),

Plaintiff and two other prisoner transcribers state that it would be impossible to download to their non-internet accessible computers without the aid of a USB drive. *Plaintiff's Affidavit* (ECF No. 74-1, PageID.1890), *Affidavit of Anthony D. Clay* (ECF No. 74-1, PageID.1892), *McGuff Affidavit* (ECF No. 74-1, PageID.1895). Moreover, although Defendant Olmstead testified that she was not made aware of pornography on Plaintiff's former computer until October 31, 2014, both Clay and McGuff state that approximately one week following Plaintiff's October 9, 2014 transfer, Defendant King had already announced to the prisoner/transcribers that Plaintiff "had pornography on his computer." (ECF No. 74-1, PageID.1892), (ECF No. 74-1, PageID.1895). Clay states further that he observed Defendant King "on" Plaintiff's computer before the transfer and "also witnessed [King] on [Plaintiff's] computer after he transferred." (ECF No. 74-1, PageID.1892). Clay also states that Plaintiff's computer stayed in the cubical area for two weeks after his transfer. *Id.* Because the finder of fact, weighing Defendant's King's denials against the contrary evidence, could reasonably conclude that Defendant King planted the pornography later found on Plaintiff's former computer, summary judgment on this claim should be denied as well.

## IV.   CONCLUSION

For these reasons, I recommend the following:

Defendant Olmstead's Motion for Summary Judgment [Doc. #67] should be GRANTED.

Defendant King's Motion for Summary Judgment [Doc. #69] should be DENIED as to the First Amendment retaliation claims. Because Plaintiff did not include Eighth Amendment claims against Defendant King in his

Amended Complaint, the arguments for their dismissal are MOOT.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 28, 2020

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on February 28, 2020, electronically and/or by U.S. mail.

<div style="margin-left: 40%;">

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen

</div>